# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

| | | |
|---|---|---|
| DEBORAH LEE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | CV 214-97 |
| HAROLD PAUL CHRISTIAN, individually | * | |
| and in his official capacity as County | * | |
| Manager of Pierce County, Georgia; CARL | * | |
| BOYETTE; TOMMY LOWMAN; TOM | * | |
| DAVIS; and MATTHEW CARTER, | * | |
| | * | |
| Defendants. | * | |

## ORDER

All of the Defendants, except Harold Christian, have filed Motions to Dismiss Plaintiff's Original and Amended Complaints. Dkt. Nos. 10, 14, 27, 29. It is those Motions that are before the Court presently. Upon due consideration, Defendants' Motions to Dismiss are **DENIED**.

## I.  FACTUAL BACKGROUND

Plaintiff Deborah Lee worked as the Director of the Pierce County Chamber of Commerce from June of 1999 until February of 2013.[1] She lives in the City of Blackshear, within Pierce County, Georgia. Dkt. No. 21, ¶ 8. Defendants in this case are

---

[1] For the purpose of these motions, the Court accepts as true the facts set forth in the Amended Complaint. Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).

Harold Paul Christian, County Manager of Pierce County; Carl Boyette, County Commissioner of Pierce County; Tommy Lowman, Better Hometown Manager for the City of Blackshear; Matthew Carter, Director of the Pierce County Industrial Development Authority, which receives substantial funding from Pierce County; and Tom Davis, the Mayor of Blackshear, Georgia, at all times relevant to the Complaint. Dkt. No. 21 ¶¶ 10-13, 15.

Plaintiff started working for the Pierce County Chamber of Commerce in June of 1999. Dkt. No. 21, ¶ 14. Throughout her employment, Plaintiff "served faithfully as [the Chamber of Commerce's] Director and performed her duties well[.]" Id. Defendant Christian became the County Manager of Pierce County in approximately August of 2011. Id. at ¶ 15. From the time he began serving in that position, Defendant Christian became a daily visitor to Plaintiff's offices at the Chamber of Commerce. Id. at ¶ 16. While visiting, Defendant Christian "was extremely friendly, helpful and encouraging"; he "often discussed with [Plaintiff] ways in which the annual financial contribution of the county to the Chamber of Commerce could be increased." Id. at ¶ 17.

Not long after his employ with Pierce County began, Defendant Christian allegedly began making frequent and inappropriate, sexually-charged comments to Plaintiff. Id. at ¶

AO 72A
(Rev. 8/82)

19. Plaintiff summarizes the nature of those comments in her

Amended Complaint:

- Opinion about the provocative nature of [Plaintiff's] physical shape;
- Comments offering [Plaintiff] a higher salary in exchange for sexual favors;
- Ongoing requests, complete with sexually-charged itinerary, that he and [Plaintiff] take out-of-town trips together at taxpayer expense;
- Comments reflecting an obsession with [Plaintiff's] manner of dressing, specifically characterizing her dress as "dressing like a hooker" and wearing "stripper shoes" to work;
- Promises to include the Chamber of Commerce in the Pierce County employment benefits program in exchange for sexual favors; and
- Promises to increase, and promises not to decrease, Pierce County's monthly contribution to the Chamber of Commerce in exchange for sexual favors.

Id. at ¶ 19. Plaintiff became fearful of being alone with

Defendant Christian and started to take steps to avoid that

possibility. Plaintiff would, for example, lock her office door

when she thought Defendant Christian might visit so it would

appear that she was not there. Id. at ¶ 20.

According to Plaintiff, Defendant Christian would go to the

local gym when Plaintiff was there, during lunch or in the

afternoon. Id. at ¶ 21. One day in June of 2012, while

Plaintiff was at the gym during lunch, "Defendant Christian

forcibly and against [Plaintiff's] will, grabbed and turned

[Plaintiff's] body and attempted to press his lips against her

lips." Id. Plaintiff quickly turned her head so that the

attempted kiss landed on her cheek. Plaintiff states that she had to "forcibly detach herself from Defendant Christian." Id. Just after the encounter, Defendant Christian blew Plaintiff a kiss as he left the gym. Id.

The next day, Defendant Christian went to the Chamber of Commerce and spoke with Plaintiff. Defendant Christian allegedly said that Plaintiff was a "nice looking woman", which was "why men would hit on [her]", and this accounted for his conduct the previous day at the gym—not "sexual harassment." Id. at ¶ 22. Defendant Carter, who shared a small office with Plaintiff, was present when Defendant Christian made these comments, and, according to Plaintiff, "remarked" on Defendant Christian's comments. Id.

Plaintiff attests that she grew fearful of further inappropriate and violent conduct by Defendant Christian. She started taking more extreme steps to avoid Defendant Christian, such as "scheduling avoidance" of him, disassociating from him at meetings, and continuing to lock the office door when she was there alone. Id. at ¶ 23. Because Defendant Carter shared office space with Plaintiff, he was sometimes inconvenienced by the locked door. Defendant Carter expressed that he knew why Plaintiff was locking the door, and that was "because she feared Defendant Christian as a result of his sexually-charged conduct and interest in her." Id. at ¶ 24.

AO 72A
(Rev. 8/82)

Plaintiff alleges that Defendant Christian enlisted the help of the other Defendants in a conspiracy to deprive her of her employment with the Chamber of Commerce. Id. at ¶ 25. According to Plaintiff, all Defendants knew about Defendant Christian's sexually-charged conduct towards and interest in Plaintiff; they also knew that Plaintiff rejected that conduct and interest. Id. at ¶ 26. Plaintiff contends that Defendants further knew that Defendant Christian sought to have Plaintiff's employment terminated because she rejected his advances. Id. at ¶ 27.

As factual support for the existence of the conspiracy, Plaintiff contends that, after the encounter between Plaintiff and Defendant Christian at the gym, all of the individual Defendants attended multiple meetings held for the purpose of having Plaintiff removed from her position of employment. Defendants allegedly discussed their reasons and strategies for achieving that purpose. Id. at ¶ 28. After one of these meetings, Defendant Carter returned to the shared office and told Plaintiff, "'[T]hey are going to squeeze you out,' in part 'by cutting the funding.'" Id. at ¶ 30. Defendant Carter also told Plaintiff, "without any sympathy", that she needed "to take a long hard look at things[.]" Id. at ¶ 31. Plaintiff contends that Defendant Carter assumed he would be chosen to replace her and offered to make her his "assistant or secretary", which

AO 72A
(Rev. 8/82)

Plaintiff characterizes as a "more traditional female role[.]" Id. Plaintiff asserts that Defendants Davis and Christian, discussing Plaintiff, told her employer that "women don't need to be going on a trip to Atlanta with men and conducting business." Id. at ¶ 29. Defendant Carter told Plaintiff's husband that he agreed with Defendants Christian and Davis that women did not need to be going on trips to Atlanta with men and conducting business. To Plaintiff's husband, Defendant Carter also said, "[Y]ou need to talk to Deborah about stepping down; she's making it hard on herself." Id. at ¶ 32.

To implement the alleged conspiracy, Defendants attempted to eliminate funding for the Chamber of Commerce in the County budget if Plaintiff was not discharged from her employment. Id. at ¶ 33. Defendants allegedly spoke with one or more Board members of the Chamber of Commerce, who hired and could fire Plaintiff, and threatened to eliminate continued funding for the Chamber of Commerce, from Pierce County or the City of Blackshear, if the Chamber of Commerce did not discharge Plaintiff. Id. at ¶ 34. According to Plaintiff, these threats were made in order to pressure Plaintiff's employer to terminate her employment. Id. at ¶ 38. Decreased funding from the County and City would decrease the effectiveness of the Chamber of Commerce and of Plaintiff's efforts to promote business in the community. Id. at ¶ 37.

6

When speaking with Chamber of Commerce Board members, "for the stated purpose of having [Plaintiff's] employment terminated," Defendants allegedly criticized Plaintiff by, for example, describing her clothing as the type worn by a stripper. Id. at ¶ 39. Defendants offered the names of male candidates who could replace Plaintiff as the Director of the Chamber of Commerce. Id. at ¶ 40. One or more Defendants proposed to the Board members that Defendant Carter should replace Plaintiff. Id. at ¶ 41. Defendants said something along the lines of, "[I]t would make it a lot easier on [Plaintiff] if she would resign [sic] her position", and she "should step down and let [Defendant Carter] be in control." Id. at ¶ 42. Plaintiff alleges that the Defendants also suggested that Plaintiff should take on a more traditional female role as Defendant Carter's assistant or secretary. Id. at ¶ 43.

Defendant Christian, "without legislative authority from the Board of Commissioners of Pierce County," actually did eliminate the County's monthly funding to the Chamber of Commerce. Id. at ¶ 35. Defendant Davis eliminated the City of Blackshear's monthly funding to the Chamber of Commerce as well. Id. at ¶ 36. Plaintiff alleges that Defendants took substantial and coordinated steps towards their goal of having Plaintiff removed from her position because of her gender. Id. at ¶ 44. Plaintiff describes that, "[a]fter months of suffering fear,

harassment and threats to her job and the financial viability of her employer, [she] did what any other reasonable person would do under the circumstances" and left her job with the Chamber of Commerce. Id. at ¶ 57.

## II. PROCEDURAL BACKGROUND

Plaintiff asserts claims of sexual battery and assault against Defendant Christian (Counts I and II). She brings claims of conspiracy to violate civil rights under 42 U.S.C. § 1985(3) and tortious interference with employment contract against all defendants (Counts IV and III). She also seeks punitive damages and litigation expenses against all defendants (Counts V and VI). Her claims against Defendant Christian are brought against him in both his official and individual capacities; her claims against the other Defendants are against them in their individual capacities only. Dkt. No. 35, pp. 4-5.

Plaintiff is no longer pursuing claims against Pierce County, Georgia. Id.

## III. LEGAL STANDARD

When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), a district court must accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor. Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Although a complaint need not contain detailed factual allegations, it must contain sufficient factual material

"to raise a right to relief above the speculative level." <u>Bell</u>
<u>Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). At a minimum,
a complaint should "contain either direct or inferential
allegations respecting all the material elements necessary to
sustain a recovery under some viable legal theory." <u>Fin. Sec.</u>
<u>Assurance, Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1282-83 (11th
Cir. 2007) (per curiam) (quoting <u>Roe v. Aware Woman Ctr. for</u>
<u>Choice, Inc.</u>, 253 F.3d 678, 683 (11th Cir. 2001)).

## IV.  ANALYSIS

### a. Federal Claims

The statute under which Plaintiff asserts her federal
claims provides,

> If two or more persons in any State or Territory
> conspire . . . for the purpose of depriving, either
> directly or indirectly, any person or class of persons
> of the equal protection of the laws, or of equal
> privileges and immunities under the laws; . . . in any
> case of conspiracy set forth in this section, if one
> or more persons engaged therein do, or cause to be
> done, any act in furtherance of the object of such
> conspiracy, whereby another is injured in his person
> or property, or deprived of having and exercising any
> right or privilege of a citizen of the United States,
> the party so injured or deprived may have an action
> for the recovery of damages occasioned by such injury
> or deprivation, against any one or more of the
> conspirators.

42 U.S.C. § 1985(3) ("§ 1985(3)").

The elements of a civil rights conspiracy cause of action
under § 1985(3) are, "(1) a conspiracy; (2) for the purpose of
depriving, either directly or indirectly, any person or class of

AO 72A
(Rev. 8/82)

persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983). As part of the second element, there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Id. (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). "[W]omen are a 'class of persons' within the meaning of § 1985(3), and therefore are protected by that provision from conspiracies against them motivated by sex-based animus." Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1339 (11th Cir. 1999) (en banc).

Defendants Boyette, Lowman, Davis, and Carter all move to dismiss Plaintiff's complaint based on their contention that she has failed to state a claim in her § 1985(3) cause of action.

Defendants Boyette, Lowman, and Davis first contend that Plaintiff has failed to sufficiently allege that there was a conspiracy against Plaintiff that was based on her gender and that acts were taken in furtherance of the conspiracy. They contend that Plaintiff's factual allegations were conclusory, and the Amended Complaint contains no factual allegation that

Defendants entered into an agreement to have Plaintiff terminated because of her female gender. Defendant Carter contends that Plaintiff's conspiracy allegations lack the required specificity and argues that parallel conduct is not sufficient to make out a claim under § 1985(3).

Plaintiff's Amended Complaint, taken as a whole, sufficiently alleges that there was an agreement by the Defendants to have Plaintiff removed from her employment and that the agreement was motivated by invidiously discriminatory animus against Plaintiff based on her female gender. Plaintiff alleged that all of the Defendants knew why Defendant Christian sought to have her employment terminated, which was because she rejected his sexually-charged conduct and interest. Plaintiff described multiple meetings at which Defendants "conspired for the purpose of having [Plaintiff] removed from her position of employment with the Chamber of Commerce" and where they "discussed the reasons underlying their conspiracy and the strategies for accomplishing their purpose." Dkt. No. 21, ¶ 28.

Such a general statement about the agreement and purpose of the conspiracy standing alone might be considered conclusory, but additional facts alleged throughout the Amended Complaint create plausible grounds to infer that Defendants agreed to bring about Plaintiff's termination because of her female gender. The fact of the agreement itself is supported by the

allegation that Defendants met multiple times to discuss their plan to have Plaintiff removed from her position. Plaintiff's description of Carter's comment to her after one such meeting ("they are going to squeeze you out" by "cutting the funding") further supports the allegation that Defendants entered the agreement alleged by Plaintiff. Dkt. No. 21, ¶ 30. The fact that funding actually was cut *additionally* supports Plaintiff's allegation of an agreement to injure her, the sole employee of the Chamber of Commerce. Defendants' conversations with Board members of the Chamber of Commerce and actions in cutting funding for the Chamber of Commerce were plausible substantial steps in furtherance of the alleged conspiracy.

Defendants take issue with the fact that there is no specific allegation that they discussed Plaintiff's gender or agreed to discriminate against Plaintiff because of her gender. Plaintiff alleged that, "Defendants took substantial and coordinated steps toward their common goal of having Mrs. Lee removed from her position of employment . . . because of her gender, female." Dkt. No. 21, ¶ 44. Again, standing alone this might be considered conclusory, but there is enough factual matter alleged throughout the Amended Complaint to find that this allegation is plausible.

Plaintiff alleges that each Defendant approached one or more members of the Board of the Chamber of Commerce and

AO 72A
(Rev. 8/82)

threatened to eliminate funding if they did not discharge Plaintiff. In those discussions, Defendants allegedly made sexually-charged criticisms of Plaintiff's clothing, proposed male candidates who could take Plaintiff's position, and suggested that, if Defendant Carter replaced Plaintiff, Plaintiff could be his secretary or assistant. In discussing Plaintiff with the Board, Defendants Davis and Christian allegedly stated, "[W]omen don't need to be going on a trip to Atlanta with men and conducting business." All of those facts, accepted as true and taken in conjunction with the allegation that Defendants agreed to work towards having Plaintiff removed, in part, because she rejected Defendant Christian's sexual advances, create a reasonable inference that Defendants agreed to have Plaintiff removed from her position because of her female gender.

While parallel conduct, without more, does not suggest conspiracy, Twombly, 550 U.S. at 556-57, Plaintiff has provided "further factual enhancement" that "nudged [her] claims across the line from conceivable to plausible[.]" Id. at 557, 570. Defendant Carter asserts that Plaintiff's allegations merely show that he was with the wrong people at the wrong time. Defendant Carter indicates that Plaintiff does not say *how* Defendant Carter "remarked" on Defendant Christian's comments,

AO 72A
(Rev. 8/82)

and he even attempted to warn Plaintiff that the other Defendants were going to squeeze her out.

It does not matter that Plaintiff's Amended Complaint did not characterize how Defendant Carter remarked on Defendant Christian's comments, because this is merely circumstantial evidence to support Plaintiff's allegation that Defendant Carter knew about Defendant Christian's sexually-charged conduct towards her.  That Defendant Carter used the word "they" when he told Plaintiff that the other Defendants were trying to "squeeze [her] out" does not render it less plausible that he was a participant in the scheme, particularly in light of the other allegations regarding him.  Plaintiff's allegations create the reasonable inference that Defendant Carter bullied her into stepping down by telling her she needed "to take a long hard look at things" and by offering her a position as his secretary or assistant.  Plaintiff alleges that Defendant Carter told her husband that he agreed with Defendants Christian and Davis that "women don't need to be going on a trip to Atlanta with men and conducting business" and stated, "you need to talk to Deborah about stepping down; she's making it hard on herself."  At this stage in the dispute, the fact that Plaintiff does not say how a trip to Atlanta was important to her job is not dispositive. Taking as true that Defendant Carter made these comments, Plaintiff has plausibly alleged that Defendant Carter

AO 72A
(Rev. 8/82)

participated in the efforts to have Plaintiff removed from her position and did so for an invidious, discriminatory reason: because she is a woman.  Plaintiff's allegations of parallel conduct have been "placed in a context that raises a suggestion of a preceding agreement[,]" including by Defendant Carter.  Id. at 557.

Defendants Boyette, Davis, Lowman, and Carter all argue that Plaintiff's failure to identify a similarly situated comparator is fatal to her § 1985(3) claim.  Dkt. No. 27, pp. 15-16; Dkt. No. 29-1, pp. 6-7.  Defendants cite several cases in support of this argument.  See Rice-Lamar v. City of Ft. Lauderdale, Fla. 232 F.3d 836, 843-44 (11th Cir. 2000) (affirming summary judgment on all claims, including § 1985(3) claim, where plaintiff did not present evidence that other insubordinate employees were treated more favorably); Williams v. Ala. Dep't of Corrs., No. 2:13-CV-606-WKW, 2014 WL 2968457, at *8 (M.D. Ala. July 2, 2014) (granting summary judgment on § 1985(3) claim because it was abandoned and because plaintiff failed to present comparator evidence); Stewart v. Fla. Dep't of Educ. & Vocational Rehab. Div., No. 5:09cv285/RS/MD, 2010 WL 3119790, at *2 (N.D. Fla. Aug. 5, 2010) (advising pro se plaintiff to identify comparators to support his equal protection and § 1985(3) claims); Newsome v. Lee Cnty., Ala., 431 F. Supp. 2d 1189, 1200 (M.D. Ala. 2006) (dismissing §

AO 72A
(Rev. 8/82)

1985(3) claim based on insufficient evidence of discriminatory animus).

In Rice-Lamar, the Eleventh Circuit Court of Appeals did not analyze the plaintiff's § 1985(3) claim after deciding that her discrimination claims under other statutes merited summary judgment. As part of the court's determination that the plaintiff had not presented any evidence that the defendant's proffered reason for firing her was pretextual, the court noted that the plaintiff failed to present comparator evidence, but it did not express that this was a requirement for stating a § 1985(3) claim. 232 F.3d 836, 843-44, n.13 ("Our disposition of Rice-Lamar's discrimination claims obviates the need for us to address her conspiracy claim under 42 U.S.C. § 1985(3)."). Stewart and Newsome both involved plaintiffs making equal protection claims in addition to their § 1985(3) claims, and Williams involved a plaintiff making a Title VII claim in addition to his § 1985(3) claim. Their discussions of the plaintiffs' § 1985(3) claims were tied to their analyses of the equal protection and Title VII discrimination claims. In the Newsome court's equal protection analysis, that court suggested that direct evidence of gender animosity might have saved the plaintiff's claims, even in the absence of comparators. 431 F. Supp. 2d at 1201 ("Newsome's allegations here do not provide the necessary comparators to furnish discriminatory intent in the

AO 72A
(Rev. 8/82)

absence of direct evidence of gender animosity and consequently cannot survive the Defendants' motion"). The Williams court's analysis of the plaintiff's Title VII claim made a similar acknowledgement: "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present.*" 2014 WL 2968457, at *4 (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)) (emphasis added). These cases suggest that it is at least possible to establish the discriminatory intent required for a § 1985(3) claim without pointing to a comparator.

The Stewart court does not describe a way in which a plaintiff could make out an equal protection claim without providing a comparator. Rather, it stated that "[i]n order to state an equal protection claim, a plaintiff must prove that he was discriminated against by establishing that other similarly situated individuals outside of his protected class were treated more favorably." 2010 WL 3119790, at *2 (citations omitted). But this case alone does not establish that a comparator is always needed to state a claim under § 1985(3).

For a § 1985(3) cause of action, the conduct of the defendants must have violated some law which protects the plaintiff, apart from § 1985(3) itself. McLellan v. Miss. Power

& Light Co., 545 F.2d 919, 925 (5th Cir. 1977).[2]  "Put more
simply, there can only be a deprivation of the rights of a
plaintiff when the action of the defendants is otherwise
illegal."  Id.; see also United Bhd., 463 U.S. at 833 (Section
1985(3) "provides no substantial rights itself" and "the rights,
privileges, and immunities that § 1985(3) vindicates must be
found elsewhere") (citations omitted).  This does not
necessarily mean that every plaintiff asserting a § 1985(3)
claim must prove a violation of the Equal Protection clause of
the Constitution.  While discussing private civil rights
conspiracies, the Fifth Circuit described, "[t]he only way,
therefore, in which one private person can deprive another of
the equal protection of the laws is by the commission of some
offence against the laws which protect the rights of persons, as
by theft, burglary, arson, libel, assault, or murder."
McLellan, 545 F.2d at 945.  In other words, even a conspiracy to
commit a violation of state law could be the basis for a §
1985(3) conspiracy.  The requirement that the plaintiff show
defendants acted with invidiously discriminatory purpose
prevents § 1985(3) from becoming a general federal tort law.
Griffin, 403 U.S. at 102 ("The constitutional shoals that would
lie in the path of interpreting § 1985(3) as a general federal

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc), the Eleventh Circuit adopted as binding precedent all decisions of the
former Fifth Circuit handed down prior to October 1, 1981.

AO 72A
(Rev. 8/82)

tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment." (internal citations omitted)).

Against this background, the Plaintiff is not, at this stage, required to identify a comparator. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12 (2002) ("It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered. Moreover, the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." (internal quotations and citations omitted)). Though the circumstances of Plaintiff's case are unique, and this is not an employment discrimination case, the second element of the prima facie case for § 1985(3) requires that Plaintiff show discriminatory intent, as is required in the employment discrimination context, and her case has many parallels to that context. The Eleventh Circuit has found that the McDonnell Douglas burden shifting framework, including its comparator requirement, is not the only way for a plaintiff to survive summary judgment in an employment discrimination case.

Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir.

2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973)).  A plaintiff can also survive summary judgment by

presenting enough circumstantial evidence to create a triable

issue of fact regarding discriminatory intent.  Such a triable

issue of fact exists if the record "presents 'a convincing

mosaic of circumstantial evidence that would allow a jury to

infer intentional discrimination by the decisionmaker.'"  Id.

(citing Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir.

2011)).  At the motion to dismiss stage, Plaintiff has alleged a

convincing mosaic of circumstantial evidence, and some of her

allegations might even be found to constitute direct evidence of

discrimination if further developed in discovery.  See Damon v.

Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358-59 (11th

Cir. 1999)(describing direct evidence as that which indicates

"the complained-of employment decision was *motivated* by the

decision-maker's ageism.").  Another reason to not require a

comparator in this case is that Plaintiff is the only person who

works for the Chamber of Commerce.  See Rioux v. City of

Atlanta, Ga., 520 F.3d 1269, 1277 (11th Cir. 2008) (considering

comparator evidence in examination of pretext rather than as

element of prima facie case, because "it is not always possible

for high ranking employees to find suitable comparators."

(citing Holifield, 115 F.3d at 1563)).  Finally, the elements of

AO 72A
(Rev. 8/82)

a § 1985(3) cause of action do not clearly require a comparator. The cause of action requires a showing that defendants were motivated by invidiously discriminatory animus, which Plaintiff has alleged by presenting circumstantial evidence aside from comparator evidence.[3]

### b. State Law Claims

Defendants Boyette, Davis, Lowman, and Carter contend that Plaintiff's state law claims against them are barred by the doctrine of official immunity.

According to the Georgia Constitution, "state officers and employees and those of its departments and agencies are subject to suit only when they negligently perform or fail to perform their 'ministerial functions' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" Gilbert v. Richardson, 452 S.E.2d 476, 483 (Ga. 1994) (citing Ga. Const., Art. I, § 2, ¶ IX(d)). "Actual malice" is distinguishable from both "malice", which is defined as conduct involving reckless disregard for the rights

---

[3] The Court recognizes the Eleventh Circuit cases stating that the preliminary step in the equal protection analysis (that is, whether there has been an Equal Protection clause violation) is the designation of comparators. See, e.g., Rodriguez v. Lamer, 60 F.3d 745, 749 (11th Cir. 1995). However, considering the actual prima facie elements of the § 1985(3) cause of action, and noting that no Eleventh Circuit case has stated that a comparator is required in a § 1985(3) suit, this case lends itself more easily to a discrimination analysis than an equal protection analysis, and the Court finds the circumstantial evidence that Plaintiff has alleged sufficient for Plaintiff's § 1985(3) claim to survive the motions to dismiss. Going forward, Plaintiff will have to show what law protecting her, independent of § 1985(3), Defendants conspired to violate. See McLellan, 545 F.2d at 925-26.

of others, and "implied malice", which involves conduct
exhibiting a reckless disregard for human life. Merrow v.
Hawkins, 467 S.E.2d 336, 338 (Ga. 1996). Actual malice requires
a deliberate intention to do wrong. Id. at 337. The intent
necessary for a showing of actual malice "must be the intent to
cause the harm suffered by the plaintiffs." Murphy v. Bajjani,
647 S.E.2d 54, 60 (Ga. 2007).

To the extent that Defendants were acting within the scope
of their employment when they engaged in the conduct at issue in
this suit, and assuming—as Defendants contend—that Defendants
were performing discretionary functions, Plaintiff has
sufficiently alleged that Defendants acted with actual malice.
Plaintiff alleged that

> Defendants acted purposely, and with malice,
> corruption and the intent to injure, when they
> conspired to have [Plaintiff's] employment terminated
> by undermining her dignity and professional reputation
> with false, sexually charged ridicule to her employer
> and others, and by threatening her employer with
> withdrawal of financial support if her employment was
> not terminated.

Dkt. No. 21, ¶ 56. Plaintiff pleaded numerous facts in support
of these allegations, and the allegations are therefore not
conclusory. Assuming the truth of Plaintiff's allegations, it
is plausible that Defendants acted with intent to cause the harm
suffered by Plaintiff each time they met and discussed squeezing
Plaintiff out or made comments aimed at bringing about an end to

AO 72A
(Rev. 8/82)

Plaintiff's employment to Plaintiff, the Board members of the Chamber of Commerce, or Plaintiff's husband. Official immunity, therefore, will not bar Plaintiff's state law claims at this stage.

Defendants Boyette, Davis, and Lowman make two additional arguments. The first is that Plaintiff may not bring an action for tortious interference with her employment contract because she resigned as opposed to being fired. The second is that Defendants were not "strangers" to Plaintiff's employment contract and were therefore privileged to interfere with it. Dkt. No. 29-1, pp. 12-13.

> The elements of a claim for tortious interference are
>
> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Tidikis v. Network for Med. Commc'ns Research, LLC, 619 S.E.2d 481, 486 (Ga. Ct. App. 2005) (citations omitted). "[I]n order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract *and* the business relationship giving rise to and underpinning the contract." Atlanta Market Center Mgmt., Co. v. McLane, 503 S.E.2d 278, 283 (Ga. 1998)(emphasis in original)

AO 72A
(Rev. 8/82)

(citations omitted) (endorsing "Court of Appeals' line of cases which, in effect reduce the number of entities against which a claim of tortious interference with contract may be maintained.").

"In Georgia one cannot state a claim for wrongful termination when it is undisputed that the employment was terminated incident to resignation." Clark v. Chick-Fil-A, Inc., 449 S.E.2d 313, 315 (Ga. Ct. App. 1994). This applies "even if the employee resigned under pressure and at the employer's request and even if the employee knew that termination action would be taken in the absence of resignation." Id. (citations omitted). While the Georgia Supreme Court has acknowledged that "an employer's immunity from liability for discharge of an at-will employee 'may not apply to discharge for a reason that is impermissible on grounds of public policy'", the "Georgia courts have refused to acknowledge any exceptions not encompassed by O.C.G.A. § 34-7-1 [the at-will employment statute], and in the absence of any express statutory provision for such a civil remedy [declined] to create judicially such a remedy." Jellico v. Effingham Cnty., 471 S.E.2d 36, 37-38 (Ga. Ct. App. 1996) (citing A.L. Williams & Assoc. v. Faircloth, 386 S.E.2d 151, 154, n.4. (Ga. 1989) (citations omitted)); see also Borden v. Johnson, 395 S.E.2d 628 (Ga. Ct. App. 1990) (finding no legislative public policy

24

exception to at-will employment doctrine when at-will employee's employment is allegedly terminated because of gender).

Plaintiff contends that she was constructively discharged and that her case is different from those cited by Defendants because her suit is against interloping third parties rather than against her employer. Plaintiff alleged that "[a]fter months of suffering fear, harassment and threats to her job and the financial viability of her employer, [Plaintiff] did what any other reasonable person would do under the circumstances, and left her employment with the Pierce County Chamber of Commerce." Dkt. No. 21, ¶ 57.

It is true that the cases Defendants cite involve wrongful termination suits against the plaintiffs' former employers rather than tortious interference claims against parties outside the employment relationship. The question for the court is thus whether Plaintiff has adequately alleged that Defendants "induced a breach of contractual obligations or caused a party or third party to discontinue or fail to enter into an anticipated business relationship with the plaintiff", in light of the fact that she resigned as opposed to being fired. Tidikis, 619 S.E.2d at 486. Plaintiff has alleged that Defendants caused the Chamber of Commerce to discontinue an anticipated business relationship with the plaintiff. Even though Plaintiff resigned, the Chamber of Commerce was caused to

AO 72A
(Rev. 8/82)

discontinue its anticipated business relationship with Plaintiff pursuant to her resignation, which was brought about by Defendants' alleged conduct. Additionally, Defendants have not pointed to cases finding that constructive discharge would not apply in the tortious interference context as opposed to the wrongful termination context. Thus, Plaintiff's tortious interference claim does not fail at the motion to dismiss stage.

Defendants next argue that because their employers, the City of Blackshear and Pierce County, provided financial support to the Chamber of Commerce, they were privileged to interfere with Plaintiff's employment contract. Plaintiff responds by arguing that, while the City of Blackshear and Pierce County might have a business relationship with the Chamber of Commerce sufficient to create a privilege to interfere in her employment contract, she has only sued Defendants in their individual capacities.[4] Moreover, Plaintiff asserts that discovery will reveal the extent to which Defendants were acting within our outside the scope of their employment.

In support of her argument, Plaintiff cites the case of Johnson v. Rogers, 448 S.E.2d 710 (Ga. Ct. App. 1994), in which the Georgia Court of Appeals noted, in reference the plaintiff's tortious interference claims, that "each claim against a defendant averred to have been acting in his or her official

---

[4] Plaintiff is still suing Defendant Christian in his official capacity.

capacity is not a claim against a stranger to the contract;
defendants, to the extent of acting within their official
capacities, were not intermeddlers acting both improperly and
without privilege." Id. at 712. This case was cited with
approval by the Georgia Supreme Court in Atlanta Market Center,
the case in which that court expressed its agreement with cases
limiting the scope of tortious interference suits and
elaborating on the stranger doctrine. 503 S.E.2d at 283.
Johnson suggests that Defendants, acting in their individual
capacities, could be deemed intermeddlers acting improperly and
without privilege. 448 S.E.2d at 712. Moreover, as Plaintiff
points out, the Amended Complaint makes no reference to the
entities on whose behalf Defendants were allegedly acting.

Additionally, the court in Atlanta Market Center, when
describing cases that rightly found the alleged interferers were
privileged to interfere, twice noted that the alleged acts of
interference were done within the scope of the interferer's
official duties. 503 S.E.2d at 282-83. For example, Atlanta
Market Center described that "it has been held that the alleged
interferer is not a stranger to the contract . . . where the
alleged interferer was the agent for one of the parties to the
contract . . . and all of the purported acts of interference
were done within the scope of the interferer's duties as agent."
Id. (citing Jet Air, Inc. v. National Union Fire Ins. Co., 375

AO 72A
(Rev. 8/82)

S.E.2d 873, 877 (Ga. Ct. App. 1988)). Another parenthetical stated, "where the alleged interferer was the corporate president of one of the contracting parties and all his purported acts of interference were within the scope of his corporate duties, he was not a stranger to the corporation's contract . . .". Id. at 282-83 (citing Nexus Servs., Inc. v. Manning Tronics, Inc., 410 S.E.2d 810, 811 (Ga. Ct. App. 1992)). While making decisions about funding the Chamber of Commerce might have been part of Defendants' official duties on behalf of their employers, it is (at least) plausible that insulting Plaintiff and pressuring the Board members of the Chamber of Commerce to fire Plaintiff by commenting on her attire and her gender (in addition to threatening to eliminate funding if the Board did not remove her from her position) were not within the scope of Defendants' official duties. Noting that Plaintiff has only brought suit against these Defendants in their individual capacities, and that Plaintiff has plausibly alleged that Defendants acted outside the scope of their official duties, the Court cannot find that Defendants were privileged to interfere with Plaintiff's employment relationship at this stage in the proceedings.

In light of the above discussion, Plaintiff has adequately stated a claim for tortious interference with her employment contract.

28

## V.    CONCLUSION

As Plaintiff has stated claims for conspiracy to violate her civil rights and for tortious interference with her employment contract, Defendants' Motions to Dismiss Plaintiff's Complaint and Amended Complaint (Dkt. Nos. 10, 14, 27, 29) are **DENIED**.

**SO ORDERED**, this 30TH day of March, 2015.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)